IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

FLAMBEAU, INC.,

                      Plaintiff,

   v.

GDL BROKERAGE, INC.,

                      Defendant.

OPINION and ORDER

19-cv-359-jdp

---

Plaintiff Flambeau, Inc. asserts breach-of-contract and tort claims against its former business partner, defendant GDL Brokerage, Inc. Flambeau's claims arise out of two allegations: (1) GDL refused to return its security deposit after Flambeau ceased leasing GDL's warehouse in Laredo, Texas; and (2) GDL failed transport a shipment of Flambeau products. GDL has moved to dismiss the case for lack of personal jurisdiction, or, in the alternative, to transfer the case to the United States District Court for the Southern District of Texas. Dkt. 10 and Dkt. 28.

The court will deny both parts of GDL's motion. GDL had extensive contacts with Wisconsin over the course of its business relationship with Flambeau. These contacts are sufficiently related to Flambeau's claims in this case to allow the court to exercise personal jurisdiction over GDL in Wisconsin. And GDL hasn't shown that considerations of convenience or the interests of justice favor litigating this case in Texas, so the court will not transfer the case.

BACKGROUND

The court draws the following facts from the allegations in Flambeau's amended complaint, Dkt. 24, as well as the parties' evidentiary submissions, Dkt. 12; Dkt. 17; Dkt. 34; Dkt. 35, which the court may consider in deciding a motion to dismiss on jurisdictional grounds. *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012).

Flambeau is a Wisconsin corporation with its principal place of business in Baraboo, Wisconsin. GDL is a Texas logistics corporation with its principal place of business in Laredo, Texas. The parties' business relationship began in 2006, although neither party provides details about their dealings with each other in the initial years of that relationship. Starting in 2012, Flambeau and GDL entered into multiple agreements relevant to this case.

A. **Lease agreement**

In December 2012, Flambeau and GDL entered an agreement under which GDL agreed to lease space to Flambeau in GDL's Laredo warehouse for $21,120 per month. *See* Dkt. 24-1. As part of that agreement, Flambeau paid GDL a security deposit of $42,240, the equivalent of two months' rent.

A year later, Flambeau and GDL entered into a separate contract for distribution services, under which GDL agreed to ship Flambeau's products to Flambeau's customers. *See* Dkt. 24-2. Flambeau agreed to pay GDL an additional $18,000 per month, and committed to sign a new three-year lease for the warehouse space. That same day, the parties executed the lease, under which Flambeau agreed to pay $22,000 per month for the warehouse space. *See* Dkt. 24-3. As with the 2012 lease agreement, the 2013 lease agreement required Flambeau to pay a two-month security deposit. Flambeau says that the security deposit it paid under the

2012 lease agreement carried over to the 2013 agreement, so it didn't pay any additional deposit.

The 2013 lease and distribution agreements were set to terminate three years later, on December 26, 2016. On December 22, 2016, Flambeau and GDL agreed to extend the lease and distribution agreements on a month-to-month basis, with slightly modified terms. Flambeau would continue to lease the warehouse space from GDL for $22,000 per month; GDL would continue to provide distribution services for a reduced fee of $8,333.33 per month. *See* Dkt. 24-4.

In February 2018, Flambeau notified GDL that it intended to terminate the month-to-month agreement as of June 30, 2018. In April, Flambeau reiterated its intent to terminate the agreement and asked for the return of its security deposit. When GDL failed to return the deposit after the agreement terminated on June 30, Flambeau made additional follow-up requests. GDL has refused to return the security deposit.

In March 2019, counsel for GDL sent Flambeau a letter accusing Flambeau of breaching its agreement with GDL and demanding $362,333.39 for unpaid invoices. *See* Dkt. 24-5, at 2. Included with the demand letter were copies of invoices from January 2017 through June 2018, which listed distribution service charges in the amount of $18,000 per month rather than the reduced $8,333.33 amount that the companies had previously negotiated. *See* Dkt. 24-5, at 4–21.

**B. Freight forwarding agreement**

In addition to storage and distribution services, GDL and Flambeau contracted for freight forwarding services. Under the companies' freight forwarding agreement, GDL was responsible for shipping Flambeau's products from a Flambeau facility in Saltillo, Mexico to

3

Flambeau's warehouse in Laredo, Texas. In January 2019, GDL was supposed to transport a shipment of Flambeau products valued at $11,488.39. GDL charged Flambeau $650 for freight and drayage, which Flambeau paid. Flambeau alleges that the shipment was transported from Mexico to the United States, but that GDL never delivered the shipment to Flambeau's warehouse in Laredo.

**C. Procedural history**

In April 2019, Flambeau filed suit against GDL in Wisconsin circuit court asserting claims for breach of contract, conversion, and violations of the Texas Property Code based on GDL's failure to return the security deposit. GDL then removed the case to this court. The court has subject matter jurisdiction under 28 U.S.C. § 1332, which requires complete diversity of citizenship and an amount in controversy more than $75,000. Flambeau is a citizen of Wisconsin and GDL is a citizen of Texas, so there is diversity of citizenship. And the amount in controversy is more than $75,000 because Flambeau is alleging that GDL wrongfully withheld a $42,240 security deposit and Flambeau is raising a claim under Texas Property Code § 93.011, which allows tenants to recover three times the amount of a security deposit withheld in bad faith. In an amended complaint filed after the removal, Flambeau asserted two additional claims: a claim for a declaratory judgment that Flambeau did not breach the parties' month-to-month agreement by paying $8,333.33 per month for distribution services in 2017 and 2018; and a claim for breach of the freight forwarding agreement.

ANALYSIS

**A. Personal jurisdiction**

GDL moves to dismiss Flambeau's claims under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. Federal courts may exercise personal jurisdiction where a party would be amenable to suit under (1) the laws of the state where the federal court sits; and (2) where jurisdiction is consistent with the requirements of due process. *KM Enterprises, Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 723 (7th Cir. 2013). If a defendant has such systematic and continuous contact with the forum that it might be regarded as at home there, the court can exercise general jurisdiction, meaning that the defendant would be subject to personal jurisdiction in that court for any claim. *Daimler AG v. Bauman*, 571 U.S. 117, 126–27 (2014). More limited contacts might support specific jurisdiction, meaning that a defendant would be subject to personal jurisdiction for claims related to its forum contacts. *Id.* Flambeau does not contend that GDL is subject to general jurisdiction in Wisconsin, so the court considers only whether the exercise of specific jurisdiction is authorized under Wisconsin law and constitutional due process requirements.

Wisconsin's long-arm statute, Wisconsin Statute § 801.05, has been interpreted to confer "jurisdiction to the fullest extent allowed under the due process clause." *Felland*, 682 F.3d at 678 (citation and quotation marks omitted). GDL did not explain in its opening brief why the requirements of the Wisconsin long-arm statute are not met here. It cited the statute in passing, but it focused its analysis entirely on the due process requirements. GDL argued for the first time in its reply briefs that Flambeau's claims do not meet § 801.05's specific statutory requirements. *See* Dkt. 16, at 2–5 and Dkt. 36, at 1–3. But challenges to personal jurisdiction may be waived, *see* Fed. R. Civ. P. 12(h)(1), and arguments raised for the first time in a reply

5

brief are forfeited. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009). In any event, the court is satisfied that jurisdiction under the long-arm statute is proper under Wisconsin Statute § 801.05(4)(a). So the court will limit its analysis to the requirements of due process.

In assessing whether an exercise of jurisdiction comports with due process, the focus is on foreseeability—whether the defendant should reasonably anticipate being sued in the forum state because of its activities there. *Kinslow v. Pullara*, 538 F.3d 687, 691 (7th Cir. 2008). The Court of Appeals for the Seventh Circuit has distilled the constitutional test for specific jurisdiction into a three-prong inquiry: (1) the defendant must have purposefully availed itself of the privilege of conducting business in the forum state or purposefully directed its activities at the state; (2) the alleged injury must have arisen from the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice. *Felland*, 682 F.3d at 673.

**1. Purposeful availment of the privilege of conducting business in Wisconsin**

For a defendant to have purposefully availed itself of the privilege of conducting business in Wisconsin, its contacts with the forum state cannot be "random, fortuitous, and attenuated," but rather must "demonstrate a real relationship with the state with respect to the transaction at issue." *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 493 (7th Cir. 2014) (citations and quotation marks omitted). Simply contracting with an out-of-state defendant is not enough, by itself, to permit specific jurisdiction. *Id.* In breach-of-contract cases, the court must conduct a context-sensitive analysis of the contract in question, examining "prior negotiations, contemplated future consequences, the terms of the contract, and the parties' course of actual dealing with each other." *Purdue Res. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 781 (7th Cir. 2003).

6

Here, the parties leave many details of their relationship vague, but it is nonetheless clear that theirs was a long-term business relationship, during which GDL had substantial contacts with Wisconsin. The relationship began in 2006, when Flambeau employees from the company's facility in Saltillo, Mexico contacted GDL about performing customs clearance for their products. At some later date, Flambeau employees came to GDL's office in Laredo and proposed that GDL "perform additional services for Flambeau." Dkt. 17, ¶ 4. "The question of which party initiated or solicited a business transaction has long been considered pertinent" to the personal-jurisdiction inquiry, *Madison Consulting Grp. v. South Carolina*, 752 F.2d 1193, 1202 (7th Cir. 1985), but it is by no means dispositive. Although Flambeau initiated the relationship, the record shows that the parties' interactions became increasingly bilateral over time.

In November 2012, Gabriela De Leon, the owner and president of GDL, traveled to Wisconsin to meet with representatives of Flambeau. In December 2012, the parties signed the original warehouse lease agreement (in Texas) and GDL provided the disputed security deposit. A year later, the parties entered into the distribution agreement. That agreement included a provision requiring Flambeau to sign a three-year lease on GDL's warehouse space, which Flambeau did. Under the distribution agreement, GDL undertook substantial contacts with Wisconsin: it shipped Flambeau's products to thousands of Flambeau's customers over the years, including 2,648 shipments to Wisconsin between July 2014 and June 2018, Dkt. 34, ¶ 5; in the course of fulfilling shipments to Flambeau's Wisconsin-based customers, GDL would often communicate directly with those customers; *id.* ¶ 7; and GDL also exchanged thousands of emails and phone calls with Flambeau employees regarding shipments under the agreement.

*Id.* ¶ 6. Flambeau doesn't say explicitly whether these calls and emails were directed to Flambeau's employees in Wisconsin, but both parties seem to assume that they were.

Flambeau and GDL had a prolonged, open-ended business relationship—precisely the kind of relationship most susceptible to the exercise of specific jurisdiction. *See Daniel J. Hartwig Assocs. Inc. v. Kanner*, 913 F.2d 1213, 1219 (7th Cir. 1990) ("[W]here a defendant has created 'continuing obligations' between himself and the residents of the forum, he manifestly avails himself of the privilege of conducting business in that forum."). GDL provided its warehouse services in Texas, but it purposefully availed itself of the privilege of conducting business in Wisconsin by creating long-term, continuing obligations with a Wisconsin company, sending its executive to Wisconsin to further that business relationship, and undertaking thousands of individual contacts with Wisconsin over the course of several years under the parties' distribution agreement.

### 2. Injury "arises out of" the defendant's contacts with the forum state

GDL concedes that it had these contacts with Wisconsin, and it concedes that its contacts under the parties' distribution agreement would be sufficient for specific jurisdiction if Flambeau were suing GDL for breach of the parties' distribution agreement. But this case concerns GDL's refusal to return the security deposit Flambeau paid under the lease agreement, which GDL says makes any contacts it had with Wisconsin under the distribution agreement irrelevant.

As a general principle, only "suit-related conduct [can] create a substantial connection with" the forum state. *Walden v. Fiore*, 571 U.S. 277, 284 (2014). In breach-of-contract cases, "it is only the dealings between the parties in regard to the disputed contract that are relevant to minimum contacts analysis." *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1278 (7th Cir.

1997) (citation and quotation marks omitted) (emphasis omitted). But as the court of appeals observed in *RAR, Inc.*, "[r]eal world commercial interactions are rarely neatly-compartmentalized by particular contract." *Id.* When parties engage in an ongoing commercial relationship involving multiple contracts and repeated transactions over time, courts look to whether the forum contacts "either bear on the substantive legal dispute between the parties or inform the court regarding the economic substance of the contract" in dispute. *Id. See, e.g.*, *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 712 (7th Cir. 2002) (concluding that the parties "entire course of contact" with respect to a business endeavor were relevant to the minimum-contacts analysis, and rejecting defendant's attempt to "dissect[]" their dealings "into two purportedly unrelated events").

Here, the parties' distribution agreement and lease agreement were part and parcel of one another. The parties negotiated the renewal of the lease agreement in conjunction with the distribution agreement; the distribution agreement explicitly required Flambeau to sign a three-year warehouse lease agreement; and GDL billed Flambeau for distribution services and warehouse rent on a single invoice each month. The clearest indication of the contracts' interrelatedness is the set of back-dated invoices that GDL sent Flambeau in March 2019. In those invoices, GDL billed Flambeau $18,000 per month for distribution services rather than the reduced $8,333.33 fee that the parties had supposedly negotiated in December 2016. This suggests that GDL withheld the security deposit because GDL contested the reduction in distribution services fees, showing that GDL regarded the lease agreement and the distribution agreement as two aspects of a single commercial relationship.

The benefits that GDL received from the distribution agreement were closely tied the benefits of the lease agreement. GDL should reasonably expect to be haled into court in

Wisconsin on claims arising out of the parties' relationship, regardless of which contract provides the basis of the specific legal claim.

### 3. Traditional notions of fair play and substantial justice

The last question in the specific-jurisdiction analysis is whether the exercise of personal jurisdiction over the out-of-state defendant would offend traditional notions of fair play and substantial justice. The burden is on the defendant to make a compelling case that exercising jurisdiction over it would be unreasonable. *Felland*, 682 F.3d at 677. Courts typically consider a set of five factors relevant to the interests of the parties, the forum state, and the interstate judicial system. *Id.* Here, GDL makes conclusory references to "fair play and substantial justice," *see* Dkt. 16, at 8, but it doesn't specifically invoke these factors, let alone explain why they might weigh against exercising specific personal jurisdiction. So GDL hasn't met its burden. And based on the court's own review, none of the factors suggest that an exercise of specific jurisdiction in this case would be fundamentally unfair to GDL.

All the requirements of due process are met, so the court will deny GDL's motion to dismiss.

## B. Transfer of venue

GDL asks in the alternative that the court transfer the case to the Southern District of Texas. It invokes Rule 12(b)(3) as the basis for its motion, but that rule applies only when venue is improper. GDL asserts that venue in this case would be proper in both Wisconsin and Texas, *see* Dkt. 10, at 12, so the proper vehicle for GDL's motion is 28 U.S.C. § 1404(a). That statute provides that:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.

Analysis under § 1404(a) calls for a case-by-case consideration of convenience and fairness, committed to the discretion of the district court. *Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 978 (7th Cir. 2010). The burden is on GDL, as the party seeking transfer, to show that transfer is warranted. *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219–20 (7th Cir. 1986).

Following the statutory language, the court will begin with the convenience to parties and witnesses, and then turn to the interest of justice.

1. **Convenience**

In assessing the relative convenience of one venue over another, courts typically consider the availability of and access to witnesses, each party's access to and distance from resources in each forum, the location of material events, and the relative ease of access to sources of proof. *Research Automation*, 626 F.3d at 978. Here, GDL says that all activities concerning the lease agreement took place in Texas, where the warehouse is located. But it doesn't explain why the physical location of the warehouse matters. It doesn't suggest, for example, that the physical condition of the warehouse is in issue or that there might be a need for an on-premises inspection of the facilities. Similarly, GDL says that "to the extent that non-party witnesses will be necessary to testify at trial, those witnesses would almost certainly be located in Texas." Dkt. 10, at 13. But GDL doesn't name any of these hypothetical third-party witnesses or explain what evidence they could bring to bear in this straightforward contract dispute.

GDL's argument boils down to concerns about its own convenience. *See* Dkt. 10, at 12 ("It would be incredibly inconvenient for GDL's employees, including Ms. De Leon, to travel to Wisconsin for purposes of trial in this matter."). That's not enough. It would be just as

inconvenient for Flambeau employees to travel to Texas for trial. "Where the balance of convenience is a close call, merely shifting inconvenience from one party to another is not a sufficient basis for transfer." *Research Automation*, 626 F.3d at 978. Because the convenience factors are neutral, they do not weigh in favor of transfer.

   2. **Interest of justice**

In the transfer analysis, the interests of justice concern "the efficient administration of the court system." *Id.* at 978. Courts typically consider docket congestion and speed to trial in each forum, each court's familiarity with the relevant law, the desirability of resolving the controversy in each locale, and the relationship of each community to the controversy. *Id.*

Here, docket congestion and speed to trial tip against transfer: this district has considerably less docket congestion than the Southern District of Texas, and civil cases get to trial almost five months faster here. *See* Dkt. 35. GDL counters that "the people of South Texas have a greater relationship to this matter than the people of Central Wisconsin" because "[n]early all underlying activity in this dispute took place in South Texas." Dkt. 10, at 14. But again, GDL doesn't explain why the physical location of the warehouse matters for purposes of a case that principally concerns a withheld security deposit. People in both states have equal interest in the enforcement of contracts entered into by businesses in their communities.

The only interest-of-justice factor that weighs in favor of transferring the case is the Southern District of Texas's relative familiarity with Texas law. But this case appears to turn on basic principles of contract law, and GDL hasn't shown that Texas law is unusual in this regard. In any case, this court is capable of applying Texas law. So, on balance, the interest-of-justice factors weigh against transfer.

ORDER

IT IS ORDERED that GDL Brokerage, Inc.'s motion to dismiss, Dkt. 10, is DENIED.

Entered December 17, 2019.

        BY THE COURT:

        /s/

        _____
        JAMES D. PETERSON
        District Judge